18 CV 7400

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA and THE
STATE OF NEW YORK, *ex rel.* MICHELE
MARTINHO,

                Plaintiffs,

        v.

GRAMERCY CARDIAC DIAGNOSTIC
SERVICES P.C. and KLAUS PETER RENTROP,

                Defendants.

Docket No. _____-cv-_____

**FILED UNDER SEAL**

**Jury Trial Demanded**

## FALSE CLAIMS ACT COMPLAINT

### INTRODUCTION

1.     *Qui tam* relator Michele Martinho ("Relator"), by her attorneys, individually and on behalf of the United States of America and the State of New York files this Complaint against Defendants Gramercy Cardiac Diagnostic Services P.C. ("Gramercy Cardiac") and Klaus Peter Rentrop ("Rentrop," together with Gramercy Cardiac, "Defendants") to recover damages, penalties, and attorneys' fees and costs for violations of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), and the New York State False Claims Act, N.Y. State Fin. Law §§ 187, *et seq.* ("NY FCA").

2.     This case concerns a kickback scheme undertaken by Gramercy Cardiac and Rentrop to obtain and keep monies belonging to the government.

3.     Rentrop is the founder and owner of Gramercy Cardiac, which is a multi-location cardiac radiology business, with locations throughout New York City.  Gramercy Cardiac

primarily performs cardiac imaging tests known as PET and SPECT scans on patients referred by physicians.

4.      Rentrop has grown Gramercy Cardiac into an enormous business that receives millions of dollars each year, largely from government funded health care plans, including Medicare and Medicaid.  Rentrop individually has been one of the highest cardiology billers to the Medicare program.

5.      In order to grow their business, Rentrop and Gramercy Cardiac resorted to a kickback scheme in which they paid physicians and medical practices for each referral they made for the imaging tests, many of which were then billed to the government.  Those referral payments violated the Anti-Kickback Statute and the Stark Law, which are intended to protect the integrity of government payments for health care services.

6.      Gramercy Cardiac and Rentrop sought to disguise their referral payments as payments under sham "independent contractor" and "lease" agreements, but as the Defendants' sales representatives made clear to Relator and other physicians, the payments were actually for the patient referrals.  Indeed, these contracts did not comply with applicable rules because they, variously, provided for variable payments that depended on the number of referrals, they did not set the aggregate compensation in advance, and they did not provide for payments at the fair market value of specified services or space.

7.      Gramercy Cardiac and Rentrop convinced physicians to enter into these improper referrals arrangements through their intensive marketing efforts.  They hired a team of promoters who approached physicians and offered to pay them the fake consulting fees and the inflated rent monies in exchange for the referral of patients for cardiac imaging tests, most of which were not medically necessary.

8.      Gramercy Cardiac and Rentrop performed thousands of cardiac imaging tests on patients covered by government funded health care plans, who were referred by physicians who received the fake consulting fees and inflated rent monies.  Even though Gramercy Cardiac and Rentrop had represented to the government that their claims for payment were not tainted by kickbacks and other illegal payments for referrals, Gramercy Cardiac and Rentrop made claims for payment to the government, and received payment from it, for such referred services.  As a result, Defendants' claims for payment were false.  Those false claims were material to the decisions by the government funded health care plans because, as the government plans have demonstrated repeatedly, they do not pay for services tainted by violations of the Anti-Kickback Law and the Stark Law.

9.      Gramercy Cardiac and Rentrop are liable to the United States and the State of New York under the FCA and NY FCA, for these Defendants have knowingly submitted to the government funded health care programs false claims for payment and, further, made and used false statements and records that were material to those claims, and conspired to accomplish these violations.

10.     These claims are brought forward by relator who is a physician to whom Gramercy Cardiac and Rentrop tried to market their kickback scheme, but she refused to take part in the illegal conduct.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).  This Court has supplemental jurisdiction over the counts relating to the NY FCA pursuant to 28 U.S.C. § 1367 and, further, pursuant to 31 U.S.C. § 3732(b).

3

12.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found, reside and transact business in this judicial district.

13.     Venue is proper in this Court under 28 U.S.C. §§ 1391(c) and 1395(a), and 31 U.S.C. § 3732(a) because the complained of illegal acts occurred within this judicial district, Defendants are resident in this judicial district, and because Defendants transact business within this judicial district.

14.     The facts and circumstances alleged in this Complaint have not been publicly disclosed in a Federal or New York State criminal, civil, or administrative hearing in which the Government or its agent is a party, in a congressional, Government Accountability Office, or other federal or state report, hearing, audit, or investigation, or in the news media.

15.     Relator is an "original source" of the information upon which this Complaint is based, as that term is used in the FCA and NY FCA.

16.     Prior to filing this action, Relator voluntarily disclosed to the United States and the State of New York the information on which its allegations are based.

17.     This action was filed within ten years after the date on which the violations complained of herein were committed, and, further, was filed within three years after the date when facts material to the right of action were known or reasonably should have been known by the officials of the United States or the State of New York charged with responsibility to act in the circumstances.

**PARTIES**

18.     Relator Michele Martinho is an individual residing in New York County.  She brings this action on behalf of the United States of America and the State of New York.

19.     Dr. Martinho is a general practice physician with a practice in New York City.

4

20.     Defendant Gramercy Cardiac is New York professional corporation formed under New York State law, with its principal place of business at 131 West 35th Street, New York, New York, and with other office locations throughout New York City, including in Queens, Brooklyn and the Bronx.

21.     Defendant Rentrop is an individual who resides in New York County.  He is the founder, owner and Chief Executive Officer of Gramercy Cardiac, and he makes all substantive decisions about the business of Gramercy Cardiac.

## APPLICABLE STATUTES

22.     Relator bring this action on behalf of the United States and the State of New York to recover funds lost to the government through violations of the FCA, the NY FCA, the Anti-Kickback Statute and the Stark Law.

23.     The federal FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986).  As relevant here, the FCA establishes treble damages liability to the United States for an individual or entity that:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
>
> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); . . .

31 U.S.C. § 3729(a)(1)(A), (B) & (C).

24.     Similarly, the NY FCA establishes treble damages liability to the State of New York for an individual or entity that:

> (a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;
>
> (b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
>
> (c) conspires to commit a violation of paragraph (a), (b), (d), (e), (f) or (g) of this subdivision; . . .

N.Y. State Fin. Law § 189(1).

25.     "Knowing" is defined in the federal and state FCAs to include actual knowledge or reckless disregard or deliberate indifference of the truth.  31 U.S.C. § 3729(b)(1); N.Y. State Fin. Law § 188(3).  In addition to treble damages, the federal and state FCAs also provides for assessment of a civil penalty for each violation or each false claim.  31 U.S.C. § 3729(a)(1); N.Y. State Fin. Law § 189(1).

26.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (the "AKS"), was enacted as a result of Congressional concern that remuneration given to those who can influence health care decisions would result in the provision of goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect patients and federal health care programs, including Medicare and Medicaid, from these harms, Congress enacted a prohibition against the payment of kickbacks in any form.  The AKS was drafted to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Social Security Amendments of 1972, Publ. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b; Medicare-Medicaid Anti-fraud and Abuse Amendments, Publ. L. No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub. L. No. 100-93.

27.     The AKS makes it illegal for individuals or entities to "offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) ... to any person to induce such person ...

to purchase, ... order, ... or recommend purchasing ... or ordering any good ... or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2).

28.     For purposes of the AKS, payment or "remuneration" includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind.  The statute covers any arrangement where one purpose of the remuneration was to obtain money for the referral of services.

29.     Falsely certifying compliance with the AKS in connection with a claim submitted to a federally funded health care program is actionable under the FCA: "A claim that includes items or services resulting from a violation of this section [*i.e.*, the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g).

30.     The Stark Law prohibits physicians from making referrals for certain kinds of health care items or services, including radiology services, to entities with which the physicians have a financial relationship, unless those relationships fall within exceptions described in the Act.  42 U.S.C. § 1395nn(a)(1).  Similarly, the Stark Law prohibits entities providing such items or services from submitting Medicare or Medicaid claims for payment based on patient referrals from physicians having a disqualifying financial relationship with the health care entity. *Id.*  The regulations under the Stark Law require that any entity collecting payment for a health care service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

31.     The Stark Law broadly defines prohibited financial relationships to include any compensation arrangement not covered by an exception provided for in the statute, in which

remuneration is paid directly or indirectly, overtly or covertly, in cash or kind to a referring physician.  42 U.S.C. §§ 1395nn(a)(2)(B) & (h)(l).

## THE GOVERNMENT HEALTH CARE PROGRAMS

32.     The Federal government pays for diagnostic testing services, such as the cardiac imaging tests Defendants performed, through programs including the Medicare program, the Medicaid program, TRICARE/CHAMPUS, CHAMPVA, and the Federal Employee Health Benefit Program.  New York State pays for diagnostic testing services through the Medicaid Program and the New York State Health Insurance Plan.

### I.  THE MEDICARE PROGRAM

33.     Medicare is a federally-funded health insurance program that covers certain medical expenses for persons over 65 years of age and persons who are disabled or who suffer from end stage renal disease.  The Medicare program is administered through the Centers for Medicare and Medicaid Services ("CMS"), which is part of the United States Department of Health & Human Services ("HHS").

34.     The Medicare program is divided into several "Parts."  Medicare Part B is a voluntary supplemental insurance plan that covers the cost of certain services performed by health care providers for program beneficiaries, including services at diagnostic testing facilities. *See* 42 U.S.C. §§ 1395k, 1395l, 1395x(s), 1395x(v)(1)(A).  Medicare Part C covers certain costs through managed care plans.

35.     HHS has appointed various private insurance companies, referred to as "carriers," to act as its agents for paying and auditing health care providers on behalf of Medicare program beneficiaries and performing other administrative services.  *See* 42 U.S.C. §§ 1395h and 1395u;

8

42 C.F.R. § 421.5(c). For Medicare Part B claims in New York State, the carrier is currently National Government Services, Inc. ("NGS")

36.    In order to participate in the Medicare program, a health care provider must sign a provider agreement. By signing the provider agreement, it agrees to comply with all Medicare requirements including fraud and abuse provisions. A provider who fails to comply with these requirements is not entitled to payment for services rendered to Medicare patients.

37.    Rentrop and other physicians employed by Gramercy Cardiac enrolled as Medicare providers and renewed their enrollments by submitting signed Forms CMS-885i, on which they certified the following:

> I, the undersigned, certify to the following: . . .
>
> 4. I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 4A of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare. . . .
>
> 8. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

38.    Medicare (and New York Medicaid) providers submit claims for payment on Form CMS-1500 or its electronic equivalent. Gramercy Cardiac and Rentrop submitted their claims for payment to the Medicare program (and to the New York Medicaid program) by using this form or its electronic equivalent.

39.    By submitting a claim for payment on Form CMS-1500, or its electronic equivalent, Defendants certified the statements on the form, including the following statement:

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license#, or SSN) of the primary individual rendering each service is reported in the designated section.

## II.   THE NEW YORK MEDICAID PROGRAM

40.    Medicaid is a public assistance program jointly funded by the federal and state governments that pays for certain medical expenses of low-income and disabled patients.  For the New York Medicaid program, funding, as a general matter, is provided equally by the federal government and the State of New York.

41.    Federal regulations require each state to designate a single state agency to administer and be responsible for the state's Medicaid program.  The New York Medicaid program is administered by the New York State Department of Health.  The program must adhere to federal guidelines.

42.    Among other things, the New York Medicaid program generally covers diagnostic services provided to program beneficiaries, including cardiac imaging tests of the type performed by Gramercy Cardiac and Rentrop.

43.    In order to participate in the New York Medicaid program, each a health care provider must sign a provider enrollment form.  By signing the form, the provider agrees that he

or she will submit claims for payment only for services actually furnished and which were
medically necessary and will comply with the rules, regulations and official directives of the
New York State Department of Health.

44.   Rentrop and other physicians employed by Gramercy Cardiac signed such New
York Medicaid provider enrollment forms.

45.   Gramercy Cardiac and Rentrop submitted claims for payment to the New York
Medicaid program on Form CMS-1500 or its electronic equivalent.  By submitting a claim for
payment in this way, they certified the statements on the form, including the following statement:

> SIGNATURE OF PHYSICIAN (OR SUPPLIER):  I certify that the
> services listed above were medically indicated and necessary to the health
> of this patient and were personally furnished by me or my employee under
> my personal direction.
>
> NOTICE:  This is to certify that the foregoing information is true, accurate
> and complete.  I understand that payment and satisfaction of this claim
> will be from Federal and State funds, and that any false claims, statements,
> or documents, or concealment of a material fact, may be prosecuted under
> applicable Federal or State laws.

## III.   OTHER GOVERNMENT FUNDED HEALTH CARE PROGRAMS

46.   The Federal Government also administers other health care programs including
TRICARE/CHAMPUS, CHAMPVA, the Federal Employee Health Benefit Program, and federal
workers' compensation programs.

47.   TRICARE/CHAMPUS is administered by the United States Department of
Defense and provides coverage for individuals (and their dependents) who are affiliated with the
armed forces.  CHAMPVA is administered by the United States Department of Veterans Affairs
and provides coverage for the families of deceased or 100% disabled veterans.  The Federal
Employee Health Benefit Program is administered by the United States Office of Personnel

11

Management and provides coverage for federal employees, retirees, and survivors. *See* 10 U.S.C. §§ 1971-1104; 32 C.F.R. § 199.4(a). *See* 38 U.S.C. §§ 1781-1786; 38 C.F.R. § 17.270(a).

48.     The New York State Insurance Plan ("NYSHIP") provides coverage to employees of the State of New York and employees of certain local governments within the State of New York. It is administered by the New York State Department of Civil Service. *See* N.Y. Civil Serv. Law § 161.

## IV.     THE PET AND SPECT SCANS BILLED FOR BY DEFENDANTS

49.     Gramercy Cardiac and Rentrop have predominantly billed the government for PET scans and their related procedures and medications, and SPECT scans and their related procedures and medications.

50.     Positron Emission Tomography (PET) is a minimally invasive diagnostic imaging procedure used to evaluate metabolism in normal tissues as well as in diseased tissues in conditions including cancer, ischemic heart disease, and some neurologic disorders. To make the scan, a radiopharmaceutical tracer is injected into the patient that gives off sub-atomic particles, known as positrons, as it decays. PET uses a positron camera (tomograph) to measure the decay of the radiopharmaceutical, and the rate of decay provides biochemical information on the metabolism of the tissue being studied.

51.     Single Photon Emission Computed Tomography Scan (SPECT) is another form of minimally invasive imaging procedure that also measures changes in a radiopharmaceutical tracer.

52.     To bill the government for their cardiac imaging services, including the PET and SPECT scans, Gramercy Cardiac and Rentrop were required to categorize their services using HCPCS or CPT codes recognized by the government funded health care plans.

53.     Most of Gramercy Cardiac's and Rentrop's billings were for PET and SPECT scans and the tracer materials used with them.  The largest number of their billings were for PET scans under HCPCS/CPT codes 78492 (for the scan) and A9555 (for the tracer).  Gramercy Cardiac performs an average of about 3,000 PET scans a month at its Manhattan location.

54.     The table below shows the HCPCS/CPT codes and descriptions that Gramercy Cardiac and Rentrop used most commonly when billing the government funded health care plans.

| HCPCS Code | HCPCS Description |
|---|---|
| 78452 | Nuclear medicine study of vessels of heart using drugs or exercise multiple studies |
| 78492 | Nuclear medicine study heart muscle at rest and/or stress multiple studies |
| 93000 | Routine EKG using at least 12 leads including interpretation and report |
| 93015 | Exercise or drug-induced heart and blood vessel stress test with EKG monitoring, physician supervision, interpretation, and report |
| 93018 | Exercise or drug-induced heart and blood vessel stress test with EKG monitoring, physician interpretation and report |
| 93040 | Tracing of electrical activity of heart using 1-3 leads with interpretation and report |
| 93224 | Heart rhythm tracing, analysis, and interpretation of 48-hour EKG |
| 93306 | Ultrasound examination of heart including color-depicted blood flow rate, direction, and valve function |
| 93320 | Doppler ultrasound study of heart blood flow, valves, and chambers |
| 93325 | Doppler ultrasound study of color-directed heart blood flow, rate, and valve function |
| 93351 | Ultrasound examination and continuous monitoring of the heart performed during rest, exercise, or drug-induced stress with interpretation and report |
| 93458 | Insertion of catheter in left heart for imaging of blood vessels or grafts and left lower heart |
| 93880 | Ultrasound scanning of head and neck vessel blood flow (outside the brain) |
| 93922 | Ultrasound study of arteries of legs |
| 93923 | Ultrasound study of arteries of legs with functional maneuvers |
| 93925 | Ultrasound study of arteries and arterial grafts of legs |
| 93970 | Ultrasound scan of veins of arms or legs including assessment of compression and functional maneuvers |
| 93978 | Ultrasound scan of vena cava or groin graft or vessel blood flow |
| 95921 | Testing of autonomic (sympathetic) nervous system function |
| 95922 | Testing of autonomic (sympathetic) nervous system function at least 5 minutes of tilt |
| 99202 | New patient office or other outpatient visit, typically 20 minutes |
| 99203 | New patient office or other outpatient visit, typically 30 minutes |
| 99204 | New patient office or other outpatient visit, typically 45 minutes |
| 99205 | New patient office or other outpatient visit, typically 60 minutes |
| 99213 | Established patient office or other outpatient visit, typically 15 minutes |

13

| 99214 | Established patient office or other outpatient, visit typically 25 minutes |
| 99215 | Established patient office or other outpatient, visit typically 40 minutes |
| A9500 | Technetium tc-99m sestamibi, diagnostic, per study dose |
| A9502 | Technetium tc-99m tetrofosmin, diagnostic, per study dose |
| A9555 | Rubidium rb-82, diagnostic, per study dose, up to 60 millicuries |
| A9560 | Technetium tc-99m labeled red blood cells, diagnostic, per study dose, up to 30 millicuries |
| J1245 | Injection, dipyridamole, per 10 mg |
| J1250 | Injection, dobutamine hydrochloride, per 250 mg |
| J2785 | Injection, regadenoson, 0.1 mg |

55.     Between 2012 and 2016, Rentrop received more than $14.3 million from the Medicare program alone for these services.  Gramercy Cardiac and its physicians billed additional amounts, including through claims for payment made to the New York Medicaid program and other government funded health care programs.

## V.     DEFENDANTS' SCHEME TO GET REFERRALS BY PAYING DOCTORS

56.     Gramercy Cardiac and Rentrop have established an elaborate scheme to pay physicians and medical practices to refer patients to them for PET and SPECT scans.  To accomplish this scheme, they hired numerous sales representatives who target general practice physicians to refer patients to Gramercy Cardiac so Gramercy Cardiac could perform and bill for these tests.

57.     Since approximately 2013, Defendants have been signing physicians and medical practices up for the referral scheme in one of two ways.  As Defendants' sales representatives described it, they had two money-making propositions for the physicians and practices, one was "clinical" and the other was "financial."

58.     Defendants' "clinical" opportunity consisted of paying the physicians to have them refer their patients to a Gramercy Cardiac location and to have the physicians be present while the patient was having a PET or SPECT scan done.  As Defendants' sales representatives

14

explained, the physician's role was to provide comfort to the patient.  Defendants would then pay the physician about $200 to $225 for each such test the physician referred.

59.    Defendants encouraged the physicians to, and the physicians did, refer patients whose habits or conditions did not warrant expensive PET and SPECT scans.  Defendants' sales representatives promoted the "clinical" opportunity by arguing that the physicians could make a lot of money because they should refer every patient who has diabetes, hyperlipidemia, or a smoking history.  Such patients, however, should not automatically be given PET or SPECT scans, and the need for such tests should be determined by an independent cardiologist, not a general practitioner.

60.    To paper the "clinical" opportunity, Defendants had the physicians sign an "Independent Contractor Agreement" with Gramercy Cardiac.  Under that agreement, the physician agreed to serve as an independent contractor to Gramercy Cardiac and would be paid on a per-test basis.

61.    The Independent Contractor Agreements provide that the contracting physician supervises the referred tests, but as Defendants sales representatives made clear, the only service required of the physician is to "comfort" the patient.  Defendants' PET and SPECT scans generally are performed by medical assistants or other non-physicians under the supervision of Rentrop or other cardiology physicians in the employ of Gramercy Cardiac.

62.    The comforting services that were provided by the contracting physicians did not have economic value.  In fact, insurance companies, including government funded health care plans, do not provide coverage for comforting services.  The payments to the contracting physicians of $200 or $225 per test was well in excess of the fair market value of such comforting services, as those services had a fair market value of $0.

15

63.     The Independent Contractor Agreements did not provide in advance for the aggregate payments that were to be made to a contracting physician.  Instead, they provided for amounts to be paid per test.  A physician who referred a large number of patients thus received more money than a physician who referred a small number of patients, even if the two physicians spent the same amount of time providing comforting services.

64.     The Independent Contractor Agreements purport to set forth a schedule for the time during which the physician is present at a Gramercy Cardiac location, but, upon information and belief, Gramercy Cardiac did not track or enforce compliance with the schedule and physicians spent only as much time at a Gramercy Cardiac location as required to provide their comforting services to their own referred patients.

65.     Defendants' "financial" opportunity consisted of having the physicians or medical practices rent space and equipment within their offices to Gramercy Cardiac so the physicians could refer patients to an on-site Gramercy Cardiac cardiologist, who would then send the patients for PET and SPECT scans at Gramercy Cardiac.

66.     To "paper" the financial opportunity, Defendants had the physicians or practices enter into a "Space and Equipment Lease Agreement" with Gramercy Cardiac.  Under that agreement, the physician or practice agreed to rent space and equipment to Gramercy Cardiac in exchange for a monthly rent.  These agreements vaguely described the rented space with descriptors such as the right to use for a period of hours "one room" or "two rooms," and described the rented equipment as the right to use a fax machine, desks, chair, a telephone, a blood pressure cuff and a computer.

67.     The purpose of the Space and Equipment Lease Agreements was to cause the contracting physicians and practices to refer patients to the Gramercy Cardiac cardiologist, who

16

would then order scans. When using the contracted space, the Gramercy Cardiac cardiologists did not see their own patients. Instead, they saw only the patients referred by the contracting physician or practice.

68.     The Space and Equipment Lease Agreements provided for rent payments that were well in excess of the fair market value of the space and equipment rented. Rather than paying just for the space and equipment, Defendants were paying for the referrals.

69.     Under the Space and Equipment Lease Agreements, Defendants agreed to pay rent of thousands of dollars a year for just a few hours' usage of the physicians' or practices' space and equipment. They decided on the amount of rent without conducting an analysis of the actual fair market value of the space and equipment, but based on the amount that would make it financially attractive for the physician or practice to refer patients to Gramercy Cardiac.

70.     To illustrate, medical office space on Coney Island Avenue in Brooklyn might cost the practice about $3 a square foot per month, so that an 80 square foot room would cost the practice about $240 per month. The practice's cost to use desks, chairs, a fax machine and a computer would be negligible. Defendants, however, would pay about $500 a month to use that same room and equipment for a total of only eight hours. Defendants further agreed to pay an additional $300 per month for use of the practice's front desk employees, a medical assistant, and a parking space.

71.     The agreements that Defendants entered into with physicians or medical practices were for the referral of patients and were financial relationships of the type prohibited by the Stark Law.

72.     Defendants and the contracting physicians, by entering into their arrangements in furtherance of Defendants' "clinical" and "financial" money-making opportunities, entered into

17

conspiracies to violate the law and defraud the government. The physicians by making referrals motivated by these arrangements, and Defendants by promoting and carrying out these arrangements, each committed overt acts in furtherance of the conspiracies.

73.     From 2013 until the present day, Relator has repeatedly been solicited by Defendants' sales representatives to participate in the "clinical" or "financial" money-making opportunities. She did not take part in the scheme, but during the course of the solicitations, Defendants described the details of their scheme and represented that numerous physicians and medical practices were taking part.

74.     Because of Defendants' arrangements to pay for referrals, Defendants received thousands of referrals of patients on whom they performed PET and SPECT scans and then billed, and received payment from, government funded health care programs.

75.     Defendants' claims for payment for those services were false because they were a result of the improper payments to physicians and medical practices for the referrals, in violation of the AKS and the Stark Law.

76.     Defendants' Independent Contractor Agreements and Space and Equipment Lease Agreements with physicians and medical practices were also false in that they sought falsely to "paper" over what were improper arrangements to pay for referrals. Such agreements, and other, related documents were thus material to Defendants' false claims for payment.

77.     Defendants made their claims for payment to the government funded health care programs without disclosing that they paid physicians and medical practices for referrals. Defendants, however, having set up their elaborate scheme, had full knowledge that they were making the payments to get referrals.

78.     Defendants had the expectation that the plans would rely on the claims for payment and Defendants' representations that they had complied with the AKS and the Stark Law, when agreeing to pay the claims.  As Defendants knew, the administrators of the government funded health care programs have repeatedly sought and received recoveries from medical providers that have violated these laws.  In fact, the government funded health care programs did rely on Defendants' false representations of compliance with the AKS and the Stark Law when it paid Defendants' claims for payment.

## COUNT I

### Violation of Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

79.     Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

80.     Defendants violated the False Claims Act by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval to the Medicare program, the New York Medicaid program, and other government funded health care programs.  Specifically, they presented bills to the government funded health care programs claiming payment for cardiac radiology tests knowing that they were billing the government for medical services that were billed for in violation of the AKS and the Stark Law in that Defendants paid for referrals of the services.

81.     As a result of this conduct, Defendants received payments of millions of dollars from the Medicare and Medicaid programs and other government funded health care programs.

## COUNT II

### Violation of Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

82.     Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

83.     Defendants violated the False Claims Act by knowingly making, using, or causing to be made or used, false records or statements that were material to false or fraudulent claims.  Specifically, Defendants made and used numerous records and statements, including their agreements with physicians and medical practices, that were material to their false and fraudulent claims, and such agreements were false in that they misrepresented the purposes for Defendants' payments to the physicians and medical practices.

84.     As a result of this conduct, Defendants received payments of millions of dollars from the Medicare and Medicaid programs and other government funded health care programs.

## COUNT III

### Violation of Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(C)

85.     Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

86.     By virtue of the acts described above, Defendants have conspired with contracting physicians and medical practices to commit violations of the False Claims Act, including by knowingly making or causing to be presented false or fraudulent claims for payment by the United States Government, its officers, employees or agents, and by knowingly making, using and/or causing to be made or used false or fraudulent statements or records to get false claims paid or that were otherwise material to such false claims.

20

87.     As a result of this conduct, Defendants received payments of millions of dollars from the Medicare and Medicaid programs and other government funded health care programs.

## COUNT IV

**Violation of New York False Claims Act**
**N.Y. State Fin. Law § 189(1)(a)**

88.     Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

89.     Defendants violated the New York False Claims Act by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval to the New York Medicaid program and the New York State Insurance Plan.  Specifically, they presented bills to the government funded health care programs claiming payment for cardiac radiology tests knowing that they were billing the government for medical services that were billed for in violation of the AKS and the Stark Law in that Defendants paid for referrals of such services.

90.     As a result of this conduct, Defendants received payments of millions of dollars from the New York Medicaid program and the New York State Insurance Plan.

## COUNT V

**Violation of New York False Claims Act**
**N.Y. State Fin. Law § 189(1)(b)**

91.     Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

92.     Defendants violated the New York False Claims Act by knowingly making, using, or causing to be made or used, false records or statements that were material to false or fraudulent claims.  Specifically, Defendants made and used numerous records and statements, including their agreements with physicians and medical practices, that were material to their

21

false and fraudulent claims, and such agreements were false in that they misrepresented the purposes for Defendants' payments to the physicians and medical practices.

93.    As a result of this conduct, Defendants received payments of millions of dollars from the New York Medicaid programs and New York State Insurance Plan.

## COUNT VI

### Violation of New York False Claims Act
### N.Y. State Fin. Law § 189(1)(c)

94.    Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

95.    By virtue of the acts described above, Defendants have conspired with contracting physicians and medical practices to commit violations of the New York False Claims Act, including by knowingly making or causing to be presented false or fraudulent claims for payment by the New York State Government, its officers, employees or agents, and by knowingly making, using and/or causing to be made or used false or fraudulent statements or records to get false claims paid or that were otherwise material to such false claims.

96.    As a result of this conduct, Defendants received payments of millions of dollars from the New York Medicaid programs and New York State Insurance Plan.

## PRAYER FOR RELIEF

WHEREFORE, the Relator, acting on behalf of and in the name of the United States of America and the State of New York, and on her own behalf, prays that judgment be entered against Defendants, jointly and severally, for violations of the Federal False Claims Act and the New York False Claims Act as follows:

(a) Enjoining and restraining Defendants from engaging in any conduct, conspiracy, contract, or agreement, and from adopting or following any practice, plan, program, scheme,

artifice or device similar to, or having a purpose and effect similar to, the conduct complained of above;

(b) Directing that Defendants pay treble damages to the federal government and the maximum civil penalties for each violation of the federal False Claims Act;

(c) Directing that Defendants pay treble damages to the State of New York and the maximum civil penalties for each violation of the New York False Claims Act;

(d) Directing that Defendants pay Relator the maximum amount pursuant to 31 U.S.C. § 3730(d) and N.Y. State Fin. Law § 190(6), as well as reasonable expenses, attorneys' fees, and costs incurred by the Relator and her counsel;

(e) Awarding Plaintiffs all costs of this civil action; and

(f) Awarding the Relator, the United States and the State of New York further relief as this Court deems just and equitable.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a jury trial.

Dated:  New York, New York
          August 15, 2018

Respectfully Submitted,

David Kovel
Randall M. Fox
Kirby McInerney LLP
825 Third Avenue, 16th Floor
New York, N.Y.  10022
Tel: (212) 371-6600
Fax: (212) 751-2540
dkovel@kmllp.com
rfox@kmllp.com

*Counsel for Plaintiff-Relator*

23